**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| RANDAL MAUDERER, | No. 21-CV-74 CJW-KEM |
| Plaintiff, | **ORDER** |
| vs. | |
| SAM BLACK, RYAN CLEMENS, MICHELLE REESE, RYAN CIZMADIA, LAINIE SMITH, BROOKE BIGE, MAKAYLA FENTON, KYLIE WILLIAMS, BRUCE VANDER SANDEN and DREW KONICEK, | |
| Defendants. | |

———————————————

**TABLE OF CONTENTS**

I.      BACKGROUND ................................................................. 3

    A.      Factual Background .................................................. 3

        1.      Failure to Accommodate .................................... 3

        2.      Failure to Protect Plaintiff ................................. 4

        3.      Retaliation by False Disciplinary Report .............. 5

        4.      Retaliation Arising out of Computer Usage ........... 5

        5.      Deliberate Indifference to Rash ......................... 6

        6.      Deliberate Indifference to Diabetes ..................... 6

B.      Procedural Background ............................................................ 7

II.     PLAINTIFF'S FAILURE TO RESPOND ............................................... 8

III.    SUMMARY JUDGMENT STANDARD ............................................... 8

IV.     DISCUSSION .................................................................................. 11

A.      Claim 1: Failure to Accommodate Mental Health Disabilities ............. 11

B.      Claim 1b: Failure to Protect Plaintiff ......................................... 14

C.      Claim 1c: Retaliation Arising out of False Disciplinary Ticket ............ 17

D.      Claim 2: Retaliation Arising out of Computer Usage ....................... 19

E.      Claim 3a: Deliberate Indifference to Rash .................................... 22

F.      Claim 3b: Deliberate Indifference to Diabetes ............................... 25

V.      CONCLUSION ................................................................................. 26

This matter is before the Court on defendants' motion for summary judgment. (Doc. 20). Plaintiff did not timely file a resistance, even after the Court granted multiple extensions (Docs. 23; 25), which violates Rule 56(b) of the Local Rules of the United States District Courts for the Northern and Southern Districts of Iowa ("Local Rules"). For the following reasons, the Court **grants** defendants' motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a former inmate who was housed at the Lary A. Nelson Center ("the Center") between September 4, 2019, and November 15, 2019. (Doc. 20-2, at 135-36). During his stay, plaintiff lodged many complaints and received several instances of discipline. (*Id.*). The Court briefly explains the facts underlying each claim. Additional facts will be provided as necessary.

#### 1. Failure to Accommodate

The parties do not dispute that plaintiff had a mental health disability. (Docs. 8, at 4; 20-2, at 136). When plaintiff criticized the overall treatment he was receiving at the Center as someone with a mental health disability and sought a "real response to the real issue," defendant Black explained to plaintiff that defendants operated a residential facility, "not a mental health treatment facility" and did not have "mental/emotional health treatment providers working here." (Doc. 20-2, at 85). Defendant Black explained to plaintiff that he operated "under the assumption that [plaintiff] [was] able to exist in a residential setting that [was] not a treatment center." (*Id.*). This assumption was supported by the Board of Parole. (*Id.*, at 86).

Still, plaintiff often complained of mistreatment due to his mental health disability. For example, when he failed to take the appropriate bus to/from job interviews, citing reasons of hypoglycemia, defendants disciplined him for violating a rule against being out of location. (Doc. 20-2, at 91-94). Plaintiff also raises as evidence of discrimination

incidents such as perceived threats from his roommates and an allegedly false disciplinary report, which the Court explains below.

### 2.    *Failure to Protect Plaintiff*

Plaintiff expressed complaints about interpersonal issues with his roommates and repeatedly verbally requested to move rooms. (Doc. 20-2, at 98, and 99). In support of the first request, plaintiff stated that his roommates were threatening him due to a hygiene issue; in response, defendant Cizmadia spoke with each roommate in the room, who complained about hygiene but denied making threats. (*Id.*, at 98). In response to the second request, a staff officer interviewed each member of plaintiff's room about multiple areas of concern, including that two roommates "were allegedly bullying" plaintiff, and warned each roommate that if "there were physical acts of violence tonight then the whole room [would] go to jail." (*Id.*, at 99).

Plaintiff also filed at least two grievances related to the same issue, one of which defendant Black denied based on the fact he had not alleged any behavior justifying a change in rooms. (*Id.*, at 97, 101).[1] In both cases, defendants Smith and Black offered to sit down with the five roommates and work through issues. (*Id.*).

Later, plaintiff requested to go to the hospital; when asked, he stated he was feeling suicidal. (*Id.*, at 100.). In response, defendants transported him to Mercy Hospital, but medical staff there determined plaintiff did not fit the criteria for being admitted. (*Id.*). The assigned nurse told defendant Cizmadia, however, that plaintiff informed her he was being threatened by two gang members in his room, and passed along plaintiff's desire to move rooms. (*Id.*). The nurse asked whether plaintiff could go to a bed at the hospital

---

[1] The first grievance was filed on October 15, 2019, and was addressed by defendant Black. (Doc. 20-2, at 97). The second grievance was filed on November 19, 2019, and was addressed by defendant Smith. (Doc. 20-2, at 101).

4

if the hospital had any beds free; defendant Cizmadia answered that he could not give her an answer because a supervisor would need to be contacted. (*Id.*).

One night, plaintiff complained that he had been punched in the lower back while he slept, again demanding to move rooms. (Doc. 20-2, at 102). The reporting staff member was unable to confirm whether the alleged assault had happened, as plaintiff could not consistently identify who had allegedly struck him. (*Id.*). That staff member further spoke with the two roommates awake at the time, and both roommates denied hitting plaintiff. Moreover, the staff member could not "tell if [plaintiff] was actually hit and if so by whom." Even so, plaintiff was immediately moved to a different, temporary room so as to prevent any possible future assault. (*Id.*).

### 3. *Retaliation by False Disciplinary Report*

During plaintiff's stay at the Center, defendant Fenton wrote plaintiff a disciplinary report for having gone outside the facility to smoke a cigarette under the guise that he was waiting for a ride to work. (Doc. 20-2, at 128, 144-45). Defendant Fenton had specifically warned plaintiff to check outside for his ride and come back in immediately if his ride wasn't there yet. *Id.* In her report, defendant Fenton specifically noted that plaintiff had been given verbal warnings and informal reports on several prior occasions for similar behavior. *Id.* She was instructed to write reports and document all rule infractions, after which point she did not control the outcome of disciplinary proceedings. *Id.*

### 4. *Retaliation Arising out of Computer Usage*

Plaintiff also complained about the job-seeking computers at the Center. (Doc. 20-2, at 104-17, 122-25). On September 8, 2019, after plaintiff filled out a grievance concerning the job-seeking computers and typed a resident-wide letter using the job-seeking computers, staff member Jenny Frasher instructed plaintiff that he could not use the job-seeking computers for that purpose. (*Id.*, at 104). On September 16, 2019, when

5

plaintiff spent "hours at a time" on the job seeking computers, defendant Bige from then on barred plaintiff from using them for more than twenty minutes at a time. (*Id.*, at 105). On September 19, 2019, defendant Clemens noted that plaintiff was banned from the computers with the exception of job-seeking purposes and had to ask for permission to use them. (*Id.*, at 107). On September 20, 2019, defendant Fenton instructed plaintiff that he could only use the computers for job-seeking purposes during normal job-seeking hours. (*Id.*, at 109). On September 26, 2019, defendant Smith told plaintiff that he would be banned from using the computer for purposes other than job-seeking, after a series of escalations. (*Id.*, at 110). This communication set out precise rules and a date by which the ban would expire unless there continued to be problems with using the computers for anything other than job seeking. (*Id.*, at 110).

### 5. *Deliberate Indifference to Rash*

Plaintiff also complained of a reaction to his medications, causing a rash. (Doc. 20-2, at 126-27). Defendant Bige "offered medical attention" and advised plaintiff "to use an icepack and calamine lotion to help with the itching and swelling." (*Id.*, at 126). When he asked to go to the emergency room, defendant Bige informed him he had not yet signed with his RRPO and thus could not go to the emergency room. (*Id.*). When plaintiff returned hours later, defendant Bige provided more calamine lotion. (*Id.*, at 127). Defendant Bige further reviewed his medical records and did not find "any possible reactions that he had complained of while incarcerated" and did not indicate that he was "on any 'new' medications that could spark a reaction." (*Id.*).

### 6. *Deliberate Indifference to Diabetes*

Plaintiff also complained about issues related to his hypoglycemia and diabetes. Plaintiff had disclosed being hypoglycemic. (Doc. 20-2, at 88, 91, 140, 141). Plaintiff also mentioned suffering from diabetes three times:

(1) on September 27, 2019, he took objection to being told neither 6JDDCS nor IDOC would be covering the costs of his community medical expenses, and asked whether he would be denied proper care in the hypothetical event he had a heart attack from failing to properly maintain his diabetes; (2) on October 27, 2019, in support of one of his requests to move rooms, he [asserted] his roommates were threatening him because he farted in his sleep, which was a side effect of his diabetes; and (3) on November 1, 2019, he requested an extra weekend pass to the YMCA by citing the negative effect of lack of physical activity on his diabetes.

(Doc. 20-2, at 141).

Defendants, however, did instruct plaintiff that he would be responsible for both obtaining and paying for his own medical care while at the Center. *Id.*

## B.   *Procedural Background*

On August 26, 2021, plaintiff's claims came before the Court after being removed by defendants from state court. (Doc. 1). On September 16, 2021, on its own motion, the Court instructed plaintiff to amend the complaint. (Doc. 7). On October 18, 2021, plaintiff filed an amended complaint. (Doc. 8). On November 1, 2021, defendants moved to dismiss or strike plaintiff's amended complaint. (Doc. 9). On January 5, 2022, the Court granted-in-part and denied-in-part without prejudice the motion to dismiss. (Doc. 11).

In that order, the Court permitted the following claims:

(1)     Claim 1, a failure to accommodate plaintiff's mental health disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against defendants Black, Reese, Smith and Konicek (Doc. 11, at 5);

(2)     Claim 1b, a failure to protect plaintiff by defendants Cizmadia, Bige, Fenton, and Reese, in violation of a constitutional duty to protect inmates or residents from harm under the Eighth Amendment (Doc. 11, at 6);

7

(3) Claim 1c, retaliation against plaintiff by defendant Fenton by way of a false disciplinary ticket in violation of Section 1983 (Doc. 11, at 7);

(4) Claim 2, retaliation by all defendants for the submission of an editorial news article (Doc. 11, at 7);

(5) Claim 3a, deliberate indifference to a rash by defendants Bige, Williams, Black, and Vander Sanden in violation of the Eighth Amendment (Doc. 11, at 8); and

(6) Claim 3b, deliberate indifference to need for diabetes care by defendants Black, Konicek, Smith, Reese and Vander Sanden. (Doc. 11, at 9).

On August 8, 2022, defendants moved for summary judgment against all of plaintiff's remaining claims. (Doc. 20). Plaintiff moved twice to extend the deadline to file a resistance. (Docs. 22; 24). The Court granted plaintiff's motion both times. (Docs. 23; 25). Nevertheless, plaintiff still did not file a timely resistance.

## II. PLAINTIFF'S FAILURE TO RESPOND

Pro se litigants are not excused from following the Local Rules. *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1067 (8th Cir. 2017); *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975). The Court may dismiss an action for refusal to comply with any rule or order of court, FED. R. CIV. P. 41(b), and may do so on its own motion. *M.S. v. Wermers*, 557 F.2d 170, 175 (8th Cir. 1977). Even though "a dismissal with prejudice is a drastic remedy," the Court may do so when plaintiff intentionally causes delay. *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984). Thus, the Court could grant defendants' motion for summary judgment based on plaintiff's noncompliance with the rules. Regardless, defendants' motion succeeds on the merits.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(a).  When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992).  It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted).  Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine.  In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.*, at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395.  The

9

plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Even so, the moving party does not meet its burden by simply providing a massive record, and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331; *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56 burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.*

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences

that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## IV. DISCUSSION

For the reasons below, the Court **grants** defendants[2] summary judgment on each claim, because defendants met their burden to show that plaintiff's evidence is insufficient to establish essential elements of each of his claims.[3]

### A. Claim 1: Failure to Accommodate Mental Health Disabilities

In Claim 1, plaintiff alleges a failure to accommodate plaintiff's mental health disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against defendants Black, Reese, Smith and Konicek. (Doc. 11, at 5). In the Eighth Circuit, a plaintiff can make a claim for a violation of rights under the ADA if the plaintiff can establish that: (1) "he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *See e.g.*, *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010).

---

[2] For each claim, the Court refers to the relevant defendants collectively as defendants.

[3] For this reason, the Court does not reach defendants' qualified-immunity arguments. (Doc. 20-3, at 20-21). The Court also does not reach defendants' respondeat-superior arguments concerning defendants Vander Sanden and Konicek. (*Id.*, at 19).

In his complaint, plaintiff centered his claim on failure to accommodate by asserting that "all of the named staff members" tried to make life more difficult for plaintiff and by offering examples of harassment centered around defendants' response to two bus rides. (Doc. 8, at 2-3). His specific examples focus on major reports issued to him due to the bus-related incidents where plaintiff ended up elsewhere than he was supposed to be. (Doc. 8, at 3). As a result, plaintiff received two major reports as discipline, one for violating the rule concerning "Out of Place of Assignment" and the other for disobeying a lawful order/directive and for failing to secure or maintain employment. (Doc. 20-2, at 91-94). Plaintiff also asserts that defendants should have allowed him to move out of the Center so that he could move to a "facility that would accept people with disabilities." (Doc. 8, at 3).[4]

Defendants seek summary judgment, asserting first that plaintiff "was not excluded from participation in or denied the benefits of any services at the Lary A. Nelson Center, nor was he discriminated against." (Doc. 20-3, at 12). Defendants also assert that plaintiff "cannot show that any of Defendants' actions towards him were because of his claimed disability." (*Id.*). The Court agrees on both assertions.

The Court finds that defendants did not exclude plaintiff from participation in nor denied plaintiff the benefits of any services at the Center.

The record indicates plaintiff was aware defendants did not operate a mental health treatment facility. When plaintiff criticized the overall treatment of someone with a mental disability and sought a "real response to the real issue," defendant Black explained to plaintiff that defendants operated a residential facility, "not a mental health treatment facility" and did not have "mental/emotional health treatment providers working here."

---

[4] As defendants note, the decision to move plaintiff from the Center rested with the Board of Parole, not with defendants. (Doc. 20-2, at 12). Thus, the Court does not consider this argument further.

(Doc. 20-2, at 85). Defendant Black explained to plaintiff that he operated "under the assumption that [plaintiff] [was] able to exist in a residential setting that [was] not a treatment center." (*Id.*). This assumption was supported by the Board of Parole. (*Id.*, at 86).

Defendant Black permitted plaintiff to use the grievance system at the Center. For example, plaintiff communicated to staff that he had interpersonal issues with his roommate (*Id.*, at 73), filed at least two grievances on that issue (*Id.*, at 95-98), and filed further complaints (*Id.*, at 100). When plaintiff claimed that one of his roommates punched him in the lower back while he slept, the record indicates that even though defendants could not confirm the allegation of violence, they moved plaintiff to a different room to prevent further possible harm. (*Id.*, at 102).

Defendants also provided options to address plaintiff's mental state. When plaintiff claimed to be suicidal, defendants had him transported to Mercy Hospital. (*Id.*, at 100). Defendants permitted plaintiff to use "the RO office," purportedly defendant Bige's office, to call a crisis hotline for 45 minutes. (*Id.*, at 87). The Generic Note indicated that defendant "[s]eemed much better after the phone call" and stated that the crisis hotline could be "a good outlet for [plaintiff] to use . . ." (*Id.*, at 87).

Defendants permitted plaintiff to use the computer for previously-permitted purposes. (*Id.*, at 104). When defendants banned plaintiff from using the computers, they still permitted plaintiff to use them for job seeking purposes. (*Id.*, at 107).

For these reasons, the Court finds plaintiff "was not excluded from participation in or denied the benefits of any services at the [ ] Center, nor was he discriminated against." (Doc. 20-3, at 12).

The Court also finds plaintiff "cannot show that any of defendants' actions towards him were because of his claimed disability." (*Id.*, at 12). It is true defendants disciplined plaintiff for rules violations. But the record does not indicate that this discipline related

at all to plaintiff's mental health disability. When plaintiff failed to take the appropriate bus to/from job interviews, he did so for reasons which he claims did not stem from his mental disability. (Doc. 8, at 1-5). The record for these hearings does not indicate any sign that defendants disciplined plaintiff for his bus usage on the basis of his disability. (Doc. 20-2, at 91, 93). Similarly, the record does not indicate any sign that defendants disciplined him for his computer usage due to plaintiff's disability. (*Id.*, 105-21).

Thus, the Court **grants** defendants' motion for summary judgment as to Claim 1.

**B.      Claim 1b: Failure to Protect Plaintiff**

In Claim 1b, plaintiff alleges a failure to protect against defendants Cizmadia, Bige, Fenton, and Reese, in violation of a constitutional duty to protect inmates or residents from harm under the Eighth Amendment. (Doc. 11, at 6). The staff at correctional facilities have a constitutional duty to protect inmates or residents from harm under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). A prison official "'violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.'" *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998) (quoting *Newman v. Holmes*, 122 F.3d 650, 652 (8th Cir. 1997)). To succeed on this claim, a prisoner must satisfy two requirements, one objective and one subjective. *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010). The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious; i.e., whether the inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834). The second requirement is subjective and requires that the inmate prove that the prison official had a "sufficiently culpable state of mind." *Id.* (quotation omitted). In prison conditions claims, which include the present failure-to-protect allegations, the subjective inquiry regarding an official's state of mind is one of

14

"'deliberate indifference' to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 834) (internal citations omitted).

Deliberate indifference requires proof that defendants "actually knew of and recklessly disregarded" this substantial risk of serious harm. *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (citing *Pietrafeso v. Lawrence Cnty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006) (emphasis added); *see Farmer*, 511 U.S. at 837). This inquiry must be viewed from the defendants' perspective at the time in question, not with hindsight's perfect vision. *Jackson*, 140 F.3d at 1152. Negligence is not sufficient to establish that a defendant acted with deliberate indifference. *Id.*; *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998).

Here, plaintiff alleged that defendants' continued refusal to move him to a different room constituted deliberate indifference to his safety. (Doc. 8, at 8). Defendants assert plaintiff could not show an objective and substantial risk of serious harm before plaintiff gave a concrete report that he had been assaulted in his sleep. (Doc. 20, at 14). Defendants further assert that plaintiff could not show that any defendant was subjectively aware of such a serious risk. (*Id.*, at 14).

Again, plaintiff expressed complaints about interpersonal issues with his roommates and repeatedly verbally requested to move rooms. (Doc. 20-2, at 98, 99). In support of the first request, plaintiff stated that his roommates were threatening him due to a hygiene issue; in response, defendant Cizmadia spoke with each roommate in the room, who complained about hygiene but denied making threats. (*Id.*, at 98). In response to the second request, a staff officer interviewed each member of plaintiff's room about multiple areas of concern, including that two roommates "were allegedly bullying" plaintiff, and warned each roommate that if "there were physical acts of violence tonight then the whole room [would] go to jail." (*Id.*, at 99).

Plaintiff also filed at least two grievances related to the same issue, one of which defendant Black denied on the ground that plaintiff had not alleged behavior justifying a change in rooms. (*Id.*, at 97, 101). In both cases, defendants Smith and Black offered to sit down with the five roommates and work through issues. (*Id.*).

Later, plaintiff requested to go to the hospital; when asked why, he stated he was feeling suicidal. (*Id.*, at 100.). In response, defendants transported him to Mercy Hospital, which determined he did not fit the criteria for being admitted. (*Id.*). The assigned nurse told defendant Cizmadia, however, that plaintiff informed her he was being threatened by two gang members in his room, and then passed along plaintiff's desire to move rooms. (*Id.*). The nurse asked whether plaintiff could go to a bed at the hospital if the hospital had any beds free; defendant Cizmadia answered that he could not give her an answer because a supervisor would need to be contacted. (*Id.*).

One night, plaintiff complained that he had been punched in the lower back while he slept, again demanding to move rooms. (Doc. 20-2, at 102). The reporting staff member was unable to confirm whether the alleged assault had happened, as plaintiff could not consistently identify who had allegedly struck him. (*Id.*). That staff member further spoke with the two roommates awake at the time, and both roommates denied hitting plaintiff. Moreover, the staff member could not "tell if [plaintiff] was actually hit and if so by whom." Even so, defendants immediately moved plaintiff to a different, temporary room, and then a different, permanent, room. (*Id.*).

On this record, it is a close call whether plaintiff presented insufficient evidence to establish a substantial risk of serious harm. Though the only evidence that supports plaintiff's assertion of a substantial risk of serious harm comes from plaintiff's own behavior, a reasonable jury could infer that plaintiff's behavior—repeatedly complaining about threats from his roommates—reflected such a substantial risk to his own safety.

Thus, the Court would not grant summary judgment on the ground of whether plaintiff established a substantial risk of serious harm.

Nevertheless, on this record, plaintiff cannot show that defendants acted with deliberate indifference to his safety. There is no dispute that defendants knew plaintiff perceived a risk from his roommates. However, defendants' conduct does not show a reckless disregard of a known risk to plaintiff's safety. Every time plaintiff mentioned a threat to his safety from his roommates, defendants promptly investigated, and the roommates with direct knowledge about the alleged threats denied making them. (Doc. 20-2, at 98, 99); *see also Jackson*, 140 F.3d 1152–53 (rejecting a finding of "reckless disregard of a known risk" when a prison officer received an anonymous note that one inmate would be stabbed by a cellmate but took steps to protect the inmate, including interviewing the inmates together, but not separating the two inmates). On the second such investigation, defendants warned the roommates that acts of physical violence that night would send plaintiff and the roommates back to jail. (*Id.*, at 99). Further, for each grievance, defendants offered to sit down with each roommate. (*Id.*, at 97, 101). When plaintiff asserted he was suicidal, defendants took plaintiff to the emergency room. (*Id.*, at 100.). Moreover, as soon as plaintiff asserted that one of his roommates punched him in the lower back while he slept, defendants moved plaintiff to a different room to prevent further possible harm even though defendants were unable to confirm the attack ever actually occurred. (Doc. 20-2, at 102).

Thus, the Court **grants** defendants' motion for summary judgment on plaintiff's claim 1b, the deliberate-indifference claim.

### C. Claim 1c: Retaliation Arising out of False Disciplinary Ticket

In Claim 1c, plaintiff alleges defendant Fenton retaliated against him by issuing a false disciplinary ticket that plaintiff alleges was subsequently disproven. (Doc. 8, at 7-

9). Defendants assert that plaintiff cannot show any causation between disciplinary actions and plaintiff's filing of grievances. (Doc. 20-3, at 15-16).

In the Eighth Circuit, the filing of a false disciplinary report against an inmate is actionable under Section 1983 if done in retaliation for the inmate's filing of a grievance. *See e.g.*, *Cowans v. Warren*, 150 F.3d 910, 911 (8th Cir. 1998). By contrast, the filing of a false disciplinary charge alone does not rise to the level of a constitutional violation, particularly if a disciplinary charge is later reversed. *See Davis v. Fudge*, No. 5:09CV00318 BSM, 2009 WL 3823729 *1, *2 (E.D. Ark. Nov. 16, 2009) (finding that a plaintiff failed to state a claim for a false disciplinary ticket that was later reversed). Likewise, there can be no valid retaliation claim if the disciplinary report was warranted for misconduct. "[C]laims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008) (citing *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990)). "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Id.* (citing *Goff v. Burton*, 7 F.3d 734, 738-39 (8th Cir. 1993).

On October 6, 2019, defendant Fenton wrote plaintiff a disciplinary report for having gone outside the facility to smoke a cigarette under the guise that plaintiff was waiting for a ride to work. (Doc. 20-2, at 128, 144-45). She had specifically warned plaintiff to check outside for his ride and come back in immediately if his ride was not there yet. *Id.* She had further noted that plaintiff had been given verbal warnings and informal reports on several prior occasions for similar behavior. *Id.*

The major report at issue was dismissed. Charges can be dismissed for various reasons, of course, so the mere dismissal of the report does not establish that it was false or unwarranted in the first instance. Nevertheless, assuming it was false, plaintiff fails to tie the filing of the disciplinary report to any particular grievance he filed. Plaintiff

asserts the report reflects dishonest and corrupt actions of the staff, and argues that the false report could not be accidental. (Doc. 8, at 8). And, later in the complaint, plaintiff asserts that this action was an act of retaliation. (Doc. 8, at 11-12). Plaintiff, however, does not explain which grievance the false disciplinary report was filed in retaliation for. As defendants note, plaintiff "does not make any specific connection in his pleadings between that disciplinary action and a particular grievance or other alleged protected activity." (Doc. 20-3, at 15). Further, there is no obvious connection between any particular grievance and the filing of the disciplinary actions. Plaintiff filed grievances on September 8, 2019, having to do with computer use for job applications, addressed by staff member Frasher. (Doc. 20-2, at 104). He also filed grievances on October 5, 2019, October 15, 2019, and November 19, 2019, all having to do with his room, which grievances were addressed by defendants Smith and Black. (Doc. 20-2, at 95, 97 & 101). The disciplinary report at issue in this claim was filed on October 6, 2019, by defendant Fenton, who was uninvolved with any of the grievances plaintiff filed. Though the timing of the report happens to fall within the time when plaintiff was filing grievances, defendant Fenton was uninvolved with any of those grievances. Again, the filing of a false disciplinary charge alone does not rise to the level of a constitutional violation, particularly if a disciplinary charge is later reversed. *See Davis*, No. 5:09CV00318 BSM, 2009 WL 3823729 at *2. So, even assuming, without deciding, that the disciplinary report was false, defendants have meet their initial burden to show that plaintiff cannot prove this claim.

For that reason, the Court **grants** defendants' motion as to Claim 1c.

### D.    *Claim 2: Retaliation Arising out of Computer Usage*

Plaintiff alleges that after he used a computer to write and submit an editorial about a union representative, all defendants engaged in a course of retaliatory conduct including but not limited to disciplinary sanctions and restrictions on his access to amenities. (Doc.

19

8, at 9-13). Defendants assert that plaintiff cannot show that the disciplinary sanctions were instituted in retaliation for plaintiff writing and submitting an editorial to a newspaper. (Doc. 20-3, at 15).

To establish a First Amendment retaliation claim under Title 42, United States Code, Section 1983, a plaintiff must show: (1) he "exercised a constitutionally protected right; (2) prison officials disciplined [him]; and (3) exercising the right was the motivation for the discipline."[5] *Haynes v. Stephenson*, 588 F.3d 1152, 1155 (8th Cir. 2009).

To satisfy a showing that "exercising the protected right motivated the discipline, [plaintiff] must show that but for a retaliatory motive the prison official would not have filed the disciplinary report." *Id.*, at 1156-57. A prisoner has a substantial burden to show that the impermissible retaliation was the actual motivating factor for the complained of action. *See Sisneros v. Nix*, 95 F.3d 749, 752-53 (8th Cir. 1996); *Cornell v. Woods*, 69 F.3d 1383, 1387-88 (8th Cir. 1995) (quotation and citations omitted). Put another way, the actions taken against a plaintiff in First Amendment retaliation claims do not satisfy these requirements if the actions were related to rational penological objectives based upon reasonable beliefs and motives. *See Gomez v. Grossheim*, 901 F.2d 686, 688 (8th Cir. 1990); *Goff*, 7 F.3d at 737; *Hazen v. Reagen*, 16 F.3d 921, 925-26 (8th Cir. 1994). Claims of retaliation thus fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule. *Hartsfield*, 511 F.3d at 829 (citing *Orebaugh*, 910 F.2d at 528). Moreover, "a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Id.* (citing *Goff*, 7 F.3d at 738–39).

---

[5] Defendants make no argument as to whether plaintiff exercised constitutionally-protected activity when he submitted the editorial or "letters complaining about the state of the facility's computer room." (Doc. 20-3, at 16).

Case 1:21-cv-00074-CJW-KEM   Document 26   Filed 01/05/23   Page 20 of 26

Plaintiff asserts that the issuance of a major report and his banning from the computers were retaliation for the editorial. (Doc. 8, at 10). Defendants seeks summary judgment against this claim, arguing that plaintiff did not show that plaintiff's editorial was the actual motivating factor for defendants' discipline. The Court agrees with defendants.

Defendants offer evidence showing that the major report stemmed from plaintiff's violation of prison rules, not out of retaliation. The Formal Report I-IV indicates that plaintiff violated Rule 4 by refusing to obey a reasonable order given by a person in authority or attempts to circumvent established procedures. (Doc. 20-2, at 124-25). It also indicates that a notice is posted above the job-seeking computers that clearly states they are only to be used for: "[j]ob seeking, education/training purposes and to document retrieval [sic] or creation of [sic] to print pay stubs." (Doc. 20-2, at 122). It then describes plaintiff as creating a letter complaining about the job-seeking computers not working properly and a separate letter to other residents encouraging them to complain to the Ombudsman about the job-seeking computers not working properly. (*Id.*, at 124-25).

So too with evidence showing that plaintiff's banning from the computers was not retaliation for the editorial but for plaintiff violating the rules. On September 8, 2019, after plaintiff filled out a grievance concerning the job-seeking computers and typed a resident-wide letter with the job-seeking computers, defendants instructed plaintiff that he could not use the job-seeking computers for that purpose. (*Id.*, at 104). On September 16, 2019, when plaintiff spent "hours at a time" on the job seeking computers, defendants from then on barred plaintiff from using them for more than twenty minutes at a time. (*Id.*, at 105). On September 19, 2019, defendants noted that plaintiff was banned from the computers with the exception of job-seeking purposes and had to ask defendants for permission. (*Id.*, at 107). On September 20, 2019, defendants instructed plaintiff that

he could only use the computers for job-seeking purposes during normal job-seeking hours. (*Id.*, at 109). On September 26, 2019, defendants communicated to plaintiff that he would be banned from using the computer for purposes other than job-seeking, after a series of escalations. (*Id.*, at 110). This communication set out precise rules and a date by which the ban would expire unless there continued to be problems with using the computers for anything other than job-seeking. (*Id.*). These communications and others provide sufficient evidence to show that banning plaintiff from the computers was in response to the violation of a prison rule to not use computers for purposes other than job-seeking, or for valid penological objectives.

For these reasons, defendants have shown sufficient evidence to negate the essential "but-for" element of plaintiff's retaliation claim. The Court thus **grants** defendants' motion as to Claim 2.

### E.    *Claim 3a: Deliberate Indifference to Rash*

In Claim 3a, plaintiff alleges deliberate indifference to a rash by defendants Bige, Williams, Black, and Vander Sanden in violation of the Eighth Amendment. (Doc. 11, at 8). Plaintiff alleges that defendants Bige, Williams, Black and Vander Sanden were deliberately indifferent to his serious medical needs because they ignored his complaints about an allergic reaction on his arm. (Doc. 8 at 13-14). He claims that without care he scratched a significant amount of skin off of his arm. (*Id.*). Defendants assert plaintiff cannot show that any of defendants consciously disregarded his need for treatment. (Doc. 20-3, at 18).

The Eighth Amendment protects against deliberate indifference to serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1238 (8th Cir. 1997) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *Butler*, 465 F.3d at 344 (collecting cases). To establish an official's deliberate indifference to a serious medical need, a plaintiff must demonstrate: (1) a substantial risk of serious harm to the inmate existed and that (2) the

prison official knew of and disregarded that risk. *Robinson v. Hager*, 292 F.3d 560, 563-64 (8th Cir. 2002) (citing *Farmer*, 511 U.S. at 832); *see also Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). For a prison official to know of and disregard that risk, "the evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (emphasis in original).

A plaintiff must first demonstrate that defendants knew of the substantial risk of serious harm to the victim. *Id.* (citations omitted). A party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk was obvious. *Id.* (collecting cases). It is sufficient to show that "the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842).

After showing knowledge, a plaintiff then must demonstrate the actor deliberately disregarded that risk. *Id.* The plaintiff must show the official "knew that their conduct was inappropriate in light of" the risk to the prisoner. *Id.* (quoting *Krout*, 583 F.3d at 567. Deliberate indifference constitutes more than mere negligence. *Farmer*, 511 U.S. at 835. It must be "more than ordinary lack of due care for the prisoner's . . . safety." *Id.* (internal quotation marks omitted). "Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." *Pietrafeso*, 452 F.3d at 983 (quoting *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995)). Further, "the obvious inadequacy of a response to a risk may support an inference that the officer recognized the inappropriateness of his conduct." *Id.* However, "[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Id.*, (citing *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)). Thus, a

"complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Nor does a plaintiff's "mere disagreement with the course of his medical treatment" support an Eighth Amendment deliberate indifference claim. *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990); *Taylor v. Norris*, 36 F. App'x 228, 228 (8th Cir. 2002).

When evaluating whether an actor deliberately disregarded a risk, however, the Court considers "his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Letterman*, 789 F.3d at 862 (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)). The Court cannot judge the action "with hindsight's perfect vision." *Id.*

Here, plaintiff filed a generic note mentioning that "he was having a reaction to the medications" and alleged itching, swelling, and an urge to scratch. (Doc. 20-2, at 126). Defendants "offered medical attention" and advised plaintiff "to use an icepack and calamine lotion to help with the itching and swelling." (*Id.*). When plaintiff asked to go to the emergency room, defendants informed him he had not yet signed with his RRPO and thus could not go to the emergency room. (*Id.*). When plaintiff returned hours later, defendants provided more calamine lotion. (*Id.*, at 127). Defendants further reviewed his medical records and did not find "any possible reactions that he had complained of while incarcerated" and did not indicate that he was "on any 'new' medications that could spark a reaction." (*Id.*, at 127).

Given that defendants could not find a basis for him to suffer possible allergic reactions in his medical records, the Court finds that plaintiff fails to show the existence of a substantial risk of serious harm to the inmate. Even if the Court found the existence of such a substantial risk, the record does not show that the prison officials knew of and

disregarded that risk. Defendants provided medical treatment and reviewed his medical records after plaintiff alerted them of his rash. Defendants, thus, have provided enough evidence to negate an essential element of plaintiff's claim for deliberate indifference. For that reason, the Court **grants** summary judgment on plaintiff's claim 3a.

### F.     *Claim 3b: Deliberate Indifference to Diabetes*

In Claim 3b, plaintiff alleges deliberate indifference to plaintiff's need for diabetes care by defendants Black, Konicek, Smith, Reese and Vander Sanden. (Doc. 11, at 9). Defendants assert that the record is "devoid of any basis for liability" with respect to plaintiff's diabetes-related claim. (Doc. 203- at 18).

Again, plaintiff must show that there existed (1) a substantial risk of serious harm to the inmate and that (2) the prison official knew of and disregarded that risk. *Robinson*, 292 F.3d at 563-64.

Here, the record does not indicate any substantial risk of serious harm to plaintiff from his diabetes. Plaintiff had disclosed being hypoglycemic. (Doc. 20-2, at 88, 91, 92, 140, 141). Plaintiff also spoke about diabetes three times:

> (1) on September 27, 2019, he took objection to being told neither 6JDDCS nor IDOC would be covering the costs of his community medical expenses, and asked whether he would be denied proper care in the hypothetical event he had a heart attack from failing to properly maintain his diabetes; (2) on October 27, 2019, in support of one of his requests to move rooms, he [asserted] his roommates were threatening him because he farted in his sleep, which was a side effect of his diabetes; and (3) on November 1, 2019, he requested an extra weekend pass to the YMCA by citing the negative effect of lack of physical activity on his diabetes. (*Id.*, at 141).

Further, defendant Black was not "aware of any evidence that [plaintiff] was denied treatment by any [d]efendant[s] related to his diabetes[,]" only that plaintiff was instructed that he "would be responsible for both obtaining and paying for his own medical care while at the Lary A. Nelson Center[.]" (*Id.*).

Although the record supports a finding that defendants knew of plaintiff's hypoglycemia, it does not show that defendants knew of or disregarded a substantial risk of serious harm to plaintiff from his diabetes or from his specific symptom of hypoglycemia.

For these reasons, the Court finds defendants have provided enough evidence to negate an essential element of plaintiff's claim 3b. For that reason, the Court **grants** summary judgment on this claim 3b.

## V. CONCLUSION

For the above reasons, the Court **grants** defendants' motion for summary judgment on all counts. (Doc. 20).

**IT IS SO ORDERED** this 5th day of January, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa